IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

**JOHN PAUL MCCULLUM,**

*Plaintiff,*

v.

**MARSHAL TURNER, TIMOTHY MORRIS, LEE SIMON, and OFFICER CHARLES TOWNSEND,** *all in their individual and official capacities,*

*Defendants.*

CAUSE NO. 3:22-CV-107-CWR-FKB

## ORDER

Before the Court are defendants Marshal Turner, Timothy Morris, and Lee Simon's *Motion for Summary Judgment Based on Failure to Exhaust Administrative Remedies*, their memorandum in support, plaintiff John Paul McCullum's response in opposition, his supporting memorandum, and the defendants' reply. *See* Docket Nos. 83, 84, 90, 91, and 93. Upon review, the motion will be denied.

**I.     Factual and Procedural History**

On January 20, 2020, John Paul McCullum was housed at Mississippi State Penitentiary ("MSP" or "Parchman")[1], in Unit 29, H building. His building was grossly

---

[1] Since 2020, Mr. McCullum has been housed at Central Mississippi Correctional Facility (CMCF), Marion County Regional Facility, Jefferson/Franklin County Correctional Facility, and South Mississippi Correctional Institution.

over-capacity, with approximately 152 incarcerated people[2] in it, he alleges, but only one correctional officer, Officer Charles Townsend. Docket No. 40 at 4. The unit was under institutional lockdown.[3] Officer Townsend, however, broke protocol and allowed people to roam freely.

As Mr. McCullum finished his shower, he was assaulted by an unidentified person with a knife. Mr. McCullum was stabbed in the neck, back, head, and shoulder. While he screamed for Officer Townsend to help him, Mr. McCullum saw the officer running away from "the zone."

In an attempt to escape his attacker, Mr. McCullum climbed the guard tower, where he continued to scream for help. Officer Townsend did not immediately call for help. Nor was Officer Townsend the only employee to behave this way. Warden Lee Simon approached the gate, saw Mr. McCullum on the guard tower screaming for help, and walked away.

Mr. McCullum was eventually taken to the prison emergency room. There, defendant Simon was taking pictures, and was advised of the seriousness of Mr. McCullum's injuries. Mr. McCullum was sent to an outside hospital in Greenville,

---

[2] *See generally* Brian Elderbroom, Felicity Rose, and Zoë Towns, *People First: The Use and Impact of Criminal Justice Labels in Media Coverage* (2021).

[3] A statewide lockdown was in place in January 2020 following multiple incidents of deadly violence at MSP, with some incidents occurring inside Unit 29. Unit 29 had previously been deemed so unsafe that plans were announced to close the unit. *See* Rick Rojas, *More Slayings at Parchman as Mississippi Confronts Prison Crisis*, N.Y. TIMES (Jan. 21, 2020) ("All the prisons across Mississippi were locked down after the explosion of gang violence, but Parchman is the only facility still under those restrictions."); Marisa Iati, *Five Mississippi inmates were killed in a week, officials say. Then two went missing*, WASH. POST (Jan. 5, 2020); Alissa Zhu, *Parchman prison Unit 29 deemed unsafe. Where will 625 Mississippi inmates go?*, CLARION-LEDGER, (Jan. 15, 2020) (reporting that in early January 2020, three incarcerated people at Parchman were killed and "MDOC has deemed Unit 29 unsafe, due to 'age and general deterioration.'").

Mississippi, and then transported by helicopter to the University of Mississippi Medical Center in Jackson. Mr. McCullum survived but continues to have pain from the stab wounds on his back and neck, along with nerve damage and emotional distress.

Mr. McCullum later filed this suit against the Mississippi Department of Corrections ('MDOC"), MSP, and four of its administrators/officers ("Officers"): Marshal Turner, Timothy Morris, Warden Simon, and Officer Townsend, in their official and individual capacities. While most of these Officers remain employed with MDOC, Officer Townsend's employment was terminated on June 26, 2023 after an arrest warrant was issued for him. He was charged with conspiring to collect unauthorized fees for contraband via CashApp from incarcerated people at MSP. Docket No. 79 at 1.

Mr. McCullum alleges that the Officers failed to intervene or take preventive measures to protect him, in violation of the Eighth Amendment. The defendants knew about the amount of violence faced at Parchman, Mr. McCullum says, and Wardens Simon and Morris (the Head Warden of Unit 29), were aware of his attacker's propensity for violence, because the attacker had assaulted someone else the week prior. The victim in that assault set a fire in his cell in a desperate attempt to save himself.

Mr. McCullum further alleges that the Officers acted with deliberate indifference to the substantial risk of harm, and that their deliberate indifference was "the driving force behind the serious injuries [Mr. McCullum] suffered and continues to suffer." Docket No. 40 at 6-7. He seeks compensatory and punitive damages.

The defendants now argue that Mr. McCullum did not exhaust his administrative remedies before filing this lawsuit. Docket No. 84. They contend that Mr. McCullum

3

never filed a grievance about the allegations raised in this lawsuit, but instead filed a grievance about missing personal property. *Id.* That grievance was rejected, they say, and Mr. McCullum never took action after he received that rejection letter dated July 14, 2020. *Id.* Defendants say Mr. McCullum signed a receipt indicating he received the rejection letter on August 5, 2020. *Id.*

Mr. McCullum presents a different story. He says in an affidavit that the defendants' claims are not true; he filed a grievance with MDOC's Administrative Remedy Program ("ARP") on February 5, 2020, and never received a response. Docket No. 90-1. The property-related grievance was his *second* ARP about the incident, *id.*, and does not form the basis of this lawsuit. Docket No. 91 at 7.

Mr. McCullum also says he asked for copies of his complaint and was told he would receive copies, but never did. When he continued to ask for copies from ARP, he was threatened with a Rule Violation Report ("RVR"). On July 13, 2020 McCullum received a letter from the ARP director telling him that the program will not make a copies for an incarcerated person, and that incarcerated persons are responsible for maintaining their own copies of their complaints. Docket No. 90-2.

**II.     Legal Standard**

"[S]ummary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quotations omitted); *see also* Fed. R. Civ. P. 56(c). At summary judgment, courts must view the facts

4

"in the light most favorable to the nonmoving party and likewise draw all reasonable inferences in that party's favor." *Ryder v. Union Pac. R.R. Co.*, 945 F.3d 194 (5th Cir. 2019).

The Prison Litigation Reform Act (PLRA), 42 U.S.C. § 1997e(a), requires incarcerated people to exhaust any available administrative remedies prior to filing suit under 42 U.S.C. § 1983. "Whether a prisoner has exhausted administrative remedies is a mixed question of law and fact." *Dillon v. Rogers*, 596 F.3d 260, 266 (5th Cir. 2010). The Fifth Circuit has held that "[s]ince exhaustion is a threshold issue that courts must address to determine whether litigation is being conducted in the right forum at the right time, . . . judges may resolve factual disputes concerning exhaustion without the participation of a jury." *Id.* at 272.

Because exhaustion is an affirmative defense, the defendants bear the burden of demonstrating that a plaintiff failed to exhaust available administrative remedies. *Id.* at 266. Defendants moving for summary judgment "must establish beyond peradventure all of the essential elements of the defense of exhaustion to warrant summary judgment in their favor." *Id.*

**III.   Discussion**

    **A.   Mississippi's Administrative Remedy Program**

Mississippi law gives MDOC the authority to create an administrative review procedure at each of its prisons to comply with the PLRA and other relevant federal law. *See* Miss. Code Ann. § 47-5-801. The ARP is the process MDOC implemented to satisfy that statute. As MDOC's Inmate Handbook explains, the ARP is the avenue for

5

incarcerated persons to "seek formal review of a complaint relating to any aspect of their incarceration." Docket No. 90-3.

The ARP is supposedly a "two-step process" but, inexplicably, also has a "step zero"—a pre-screening step. Docket No. 93-4 (MDOC SOP 20-08-01). The Court will attempt to explain all of the steps here.

<u>Step Zero:</u> The process begins when the incarcerated person sends a grievance to the ARP Director explaining their claim and the relief sought. *Id.* The ARP Director "will screen" the request, then provide "[n]otice of the request's acceptance or rejection . . . by Form ARP-1." Docket No. 90-3 at 1-2. If the ARP is rejected "for technical reasons or matters of form" the incarcerated person has five days to submit a corrected grievance. *Id.*

<u>Step One:</u> "If the MDOC ARP Director accepts the complaint, he/she or the appropriate person will respond to the complaint." Docket No. 93-4 at 4. The response is due 40 days from the grievance's "acceptance" into the program. *Id.* at 5. The First Step Response form is the "Form ARP-2." Docket No. 90-3 at 1.[4] The incarcerated are informed that this form must be used "to continue additional steps in the process, there is no need to try to rewrite the original letter or request in this limited space. The original letter of request is available to all reviewers at each step of the process. The inmate must merely give a reason for their dissatisfaction with the previous response." *Id.*

---

[4] Mr. McCullum cites to the MDOC Inmate Handbook, which was provided to him, while the defendants rely on the MDOC Standard Operating Procedure, "MDOC SOP," 20-08-01 for an explanation of the ARP process. Both documents include similar, but not exact, procedural information.

6

Step Two: Within five days of receipt of the First Step decision, an incarcerated person "who is dissatisfied with the First Step response may appeal to the ARP Director[.]" Docket No. 93-4 at 5. The First Step envelope and Form ARP-2 are to "be used by the inmate to continue additional steps in the process . . . . The inmate must merely give a reason for their dissatisfaction with the previous response." Docket No. 90-3 at 1. "A final decision will be made by the Superintendent, Warden or Community Corrections Director and the offender will be notified within 45 days of receipt." Docket No. 93-4 at 5. "If an offender is not satisfied with the Second Step response, he may file suit in Court." *Id.*

When an incarcerated person is transferred away from one institution and later files a grievance regarding "an action taken by the sending institution, the sending institution will complete the processing through the First Step. The Warden of the receiving institution will assist in communication with the offender." *Id.* at 7.

**B.   Analysis**

ARP No. MSP-20-946, which was about Mr. McCullum's missing property, explains that he was discharged from UMMC to CMCF on January 22, 2020. Accepting this as accurate, Mr. McCullum would have been at CMCF when he needed to send the ARP Director at MSP his grievance about the stabbing.

In a sworn affidavit, Mr. McCullum says he did so on February 5, 2020. Docket No. 90-1. He never received a response about this grievance. *Id.* He then says that when he asked for copies of the complaint he submitted, he was told he would receive copies, but that never happened. *Id.* He began complaining that he was being "lied to by the ARP

7

staff." *Id.* And when he continued to complain, he "was then threatened" by Warden Wendell Banks that he would receive a RVR for being disrespectful to staff. *Id.*

The defendants respond with competing affidavits. Paul Pennington, Jr., the Statewide Director for the Administrative Remedy Program, attests that the "ARP has no record of receiving this request on or around the date in which Offender John McCullum, #R5586 claims to have submitted this request." Docket No. 83-1. The defendants' reply includes similar affidavits from Brenetta Hoskins (the Correctional Team Lead for the ARP) and Le Tresia Stewart (the custodian for the ARP at CMCF). Docket No. 93-1 and 93-2.[5]

## 1. Discovery and Availability of Administrative Remedies

The parties first dispute whether Mr. McCullum's first stabbing grievance existed. Did he send it to ARP in February 2020, as he attests?

The ARP that is present in the record, ARP No. MSP-20-946, regarding Mr. McCullum's personal property, is dated February 9, 2020. The stamp on it, however, indicates that it was received by MDOC "INMATE LEGAL ASSISTANCE PROGRAM" on June 17, 2020. Docket No. 83-1 at 3. There is a second stamp: "RECEIVED JUN 23 2020 CMCF-ARP." *Id*. Also, atop this ARP is a handwritten note which says: "This is a handwritten copy that I filed in Feb. 2020 I've yet to receive a response." *Id*. This may mean that MDOC lost or ignored the second grievance until Mr. McCullum handwrote a

---

[5] New evidence cannot be submitted in reply, because the non-movant lacks an opportunity to respond to it. The Court does not rely upon this evidence in rendering today's ruling.

copy and resubmitted it months later, or it could simply be a note Mr. McCullum wrote to cover his tracks. This Court is not certain.

What is clear, however, is that an issue of fact exists regarding the first stabbing grievance allegedly submitted in February 2020.

*Dillon v. Rogers* is instructive. In *Dillon*, a detainee in Louisiana was transferred to a different facility and did not complete the second step of Louisiana's ARP. He argued that there was not a remedy available to him. 596 F.3d at 266. The Fifth Circuit remanded for discovery, explaining that "in some cases, unique circumstances may arise that necessitate allowing some discovery prior to ruling, such as where the availability of administrative remedies is contested." *Id.* at 273 n.4.

Here, as Mr. McCullum emphasizes, the defendants' motion for summary judgment was filed before discovery could be completed. Docket No. 91 at 7. No inquiry into the availability of remedies was made, apparently, despite Mr. McCullum's attestation that the grievance he submitted "would be in the sole custody of the MDOC." *Id*. That was error.

A more recent Fifth Circuit decision also suggests that summary judgment would be inappropriate here. In *Favela v. Collier*, No. 22-40415, 2024 WL 350361 (5th Cir. Jan. 31, 2024), an incarcerated person in Texas sued prison officials for failing to prevent his assault by another incarcerated person. The defendants argued that they should be granted summary judgment because there was no Step 1 or Step 2 grievance forms pertaining to the plaintiff's claims. *Id.* at 2. But the plaintiff submitted a declaration

9

indicating that he submitted a grievance about his assault and the medical treatment he needed afterwards, yet he never received a response from prison officials.

The Fifth Circuit determined that the plaintiff's declaration created a genuine issue of material fact because he provided specific facts to counter the defendants' showing that he did not exhaust his administrative remedies. *Id.* at 4. The appellate court drew support from an analogous case, *Paladino v. Newsome*, 885 F.3d 203 (3d Cir. 2018), which also found summary judgment improper where the incarcerated plaintiff produced sworn testimony that he had submitted multiple grievances about excessive force. *Id.* Ultimately, the Fifth Circuit remanded the case for exhaustion-related discovery.

This is our situation here. Mr. McCullum's sworn affidavit says that his property ARP was the *second* one he submitted about this incident. Docket No. 90-1. He says he sent a first ARP "solely about the stabbing incident." *Id.* Under the summary-judgment standard, we must view the evidence in the light most favorable to the non-movant. This dispute over the existence of the stabbing grievance creates a genuine issue as to exhaustion. Discovery is necessary before the issue can be considered again.

### 2. Opaqueness of the Administrative Scheme

While defendants challenge the existence of the first grievance, they argue in the alternative that Mr. McCullum failed to exhaust his administrative remedies even if the first grievance was sent to ARP. In their reply, they contend that when Mr. McCullum "failed to receive a response to his grievance, the ARP grievance procedure requires that Plaintiff proceed to the second step, and not give up on the process." Docket No. 93 at 2-3. They say the ARP Director "had forty days to respond to Plaintiff's grievance." *Id.* at 3.

10

And "[u]pon expiration of forty days, Plaintiff's *sole* remedy was to move to the second step. He did not." *Id.* (emphasis added).

Here, defendants rely on the Fifth Circuit's decision in *Wilson v. Epps*, 776 F.3d 296, 302 (5th Cir. 2015) for the proposition that under Fifth Circuit precedent, an incarcerated person must proceed through both steps of the ARP process, "even if MDOC failed to respond at either of the preliminary steps." Docket No. 93 at 3.

While MDOC policy and *Wilson* support the proposition of moving onto the next step of the ARP if one doesn't receive a response, the Supreme Court has noted that "the PLRA contains its own, textual exception to mandatory exhaustion." *Ross v. Blake*, 578 U.S. 632, 642 (2016). "Under § 1997e(a), the exhaustion requirement hinges on the 'availab[ility]' of administrative remedies: An inmate, that is, must exhaust available remedies, but need not exhaust unavailable ones." *Id.* The Court went on to explain three circumstances where an administrative remedy may be unavailable: 1) when prison officials are "unable or consistently unwilling to provide any relief to aggrieved inmates," 2) when the "administrative scheme might be so opaque that it becomes, practically speaking, incapable of use" so much that "no ordinary prisoner can discern or navigate it[,]" *or* 3) "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 643-44; *see also Hinton v. Martin*, 742 F. App'x 14, 15 (5th Cir. 2018).

Accepting the evidence Mr. McCullum has submitted as true, as we must at summary judgment, "[t]he second and third circumstances are implicated here." *Huskey v. Jones*, 45 F. 4th 827, 832 (5th Cir. 2022). As the below discussion will explain, MDOC

11

policy is *not* clear that incarcerated persons ignored or otherwise stuck in pre-screening limbo can move onto Step 2, and the threat of an RVR made to Mr. McCullum may have thwarted him from taking advantage of the grievance process.

Again, Defendants say the ARP Director had 40 days to respond to Mr. McCullum's initial complaint. Docket No. 93 at 3. They direct the Court to MDOC policy to argue that Mr. McCullum should have known to proceed to the second step after he received no response. Yet, MDOC's policy is not so clear.

The policy indicates the 40-day time limit is for a First Step response. Docket No. 93-4 at 4-5. In other words, it provides the maximum allowable time between a grievance's "acceptance" into the program (conveyed via Form ARP-1), and the official's response (conveyed via Form ARP-2). But if a person never receives a Form ARP-1 from the ARP Director showing the result of pre-screening, the time never begins to run. The incarcerated person has no idea where they are in the process.

That is the problem in Mr. McCullum's situation. The available evidence indicates that he filed his stabbing grievance on February 5, 2020. It was neither accepted nor rejected into the ARP. He was stuck in pre-screening limbo.

Defendants, through counsel, claim Mr. McCullum should have known that his "sole remedy was to move to the second step." Docket No. 93 at 3. They are suggesting that Mr. McCullum leapfrog a step—going from Step Zero to Step Two—when MDOC policy plainly says "expiration of response time limits will entitle the offender to move

12

on to the *next* Step in the process." Docket No. 93-4 at 5 (emphasis added).[6] That does not make sense.

If learned counsel for the defendants can be mistaken as to what should happen when the ARP Director fails to do their job at pre-screening, the typical incarcerated person would be unsure of the next step as well. In these circumstances, the process is opaque. Nothing validates counsel's suggestion that an incarcerated person should have skipped forward to Step Two. So, the Court is unpersuaded that it can hold Mr. McCullum to such a suggestion, either.

### 3. Intimidation of Mr. McCullum

Lastly, Mr. McCullum attests that after he did not receive a response to his first ARP grievance, he asked for copies of the grievance but was "threatened by Warden Wendell Banks" that he would receive an RVR. Docket No. 90-1 at 1. It's not difficult to conceive that threats to incarcerated people by prison officials are especially pernicious.[7] Defendants have not challenged this claim.

Because the Court has already determined above that the process is opaque for an incarcerated person in Mr. McCullum's circumstance, further analysis regarding the impact of the alleged threat is not needed at this time. This claim could implicate the third circumstance in *Ross* if the prison administrator did intimidate Mr. McCullum with the threat of disciplinary action when he attempted to follow up on the missing grievance.

---

[6] Additionally, the Inmate Handbook states that to continue to Step Two, Form ARP-2 and the accompanying ARP envelope "must" be used to continue the procedure. Docket No. 93-3 at 16.

[7] *See* Giovanna Shay, *Exhausted*, 24 Fed. Sent. R. 287, 289 (2012) ("intimidation or threats by prison officials can render an administrative remedy unavailable under the PLRA's exhaustion provision.") (quoting *Tuckel v. Grover*, 660 F. 3d 1249, 1252 (10th Cir. 2011)).

But it is not necessary to consider that now.[8] The parties should move on to discovery into exhaustion and the merits of Mr. McCullum's claims.

## IV. Conclusion

The *Motion for Summary Judgment* is denied.

**SO ORDERED**, this the 28th day of February, 2024.

s/ Carlton W. Reeves
UNITED STATES DISTRICT JUDGE

---

[8] The Court will note that just prior to the release of this Order, The Department of Justice issued a report of its four-year investigation of the Mississippi Department of Correction and made a number of findings, including that MDOC fails to adequately supervise people in housing units and that it fails to properly investigate incidents of serious harm. *See* U.S. Dep't of Justice, *Investigation of Central Mississippi Correctional Facility, South Mississippi Correctional Institution, and Wilkinson County Correctional Facility* (Feb. 28, 2024) https://www.justice.gov/d9/2024-02/2024.02.26_ms_doc_findings_report_it_508_reviewed_0.pdf. This newest report comes after a previous investigative report by the Department of Justice detailing similar findings at Parchman. *See* U.S. Dep't of Justice, *Investigation of the Mississippi State Penitentiary (Parchman)* (Apr. 20, 2022), https://www.justice.gov/crt/case-document/file/1495956/download. These issues are at the heart of Mr. McCullum's lawsuit.